## PEOPLE v. FIELDING.

(Supreme Court, Appellate Division, Second Department.   January 17, 1899.)

1. OFFICERS—FALSE AUDITING—CERTIFYING FRAUDULENT CLAIMS.

Pen. Code, § 165, providing that a public officer, or one discharging the duties of an office or place of trust, in a city, whose duty is to audit, allow, or pay claims on the city, who knowingly audits, allows, or pays, or directly or indirectly consents to or in any way connives at the auditing, allowance, or payment of, any false or fraudulent claim against such city, is guilty of felony, authorizes the indictment of a deputy commissioner of city works, who corruptly certifies as "approved" claims for street work, though such act was not of itself an act of false auditing, since, under Brooklyn City Charter, tit. 4, § 1, providing that no expenditures or disbursements shall be paid, except on vouchers properly certified and audited, the auditor is obliged to base his action on such certification.

2. SAME—CERTIFICATION BY "DEPUTY."

It is immaterial, under that statute, whether such deputy was authorized to so certify the claim while the commissioner was present, and not physically disabled, since, if the certification was not by an officer having cognizance of the certification, it was by one discharging the duties of "the office or place of trust."

3. SAME—CRIMINAL KNOWLEDGE—REASONABLE DOUBT.

Where the deputy commissioner of public works, empowered to make contracts for work costing less than $2,000, made such a contract, and within 52 days thereafter certified 10 other claims for the same work at substantially the same price,—in some instances, 2 in one day,—without calling for any new proposals, there can be no reasonable doubt of his criminal knowledge that the last one was fraudulent.

4. SAME—EVIDENCE—ADMISSIBILITY.

In a prosecution for conniving at the auditing of fraudulent claims for city work, evidence that accused, as deputy commissioner of city works, had certified for audit 10 prior claims for the same work, is admissible to show guilty knowledge of the fraudulent character of the one in question.

5. SAME.

In a prosecution for conniving at the auditing of fraudulent claims against the city, under Pen. Code, § 165, making such act a felony, testimony of the auditor that in auditing it he made no other investigation than an examination of the bill itself, which bore a false certification by accused as deputy commissioner of city works, was admissible to show that such certification was part of the evidence on which the claim was audited.

6. SAME—HARMLESS ERROR.

In a prosecution for conniving at the auditing and allowance of fraudulent claims against a city, accused was not prejudiced by the admission of claimant's testimony that he had paid accused a certain portion of the money received from previous jobs, and would do the same on the one in question; he having testified without objection that on still a different job he paid accused the same proportion of the proceeds.

7. WITNESSES—ACCOMPLICES—CORROBORATION.

In a prosecution for conniving at the auditing and allowance of fraudulent claims for city work, the contractor testified that he had paid accused, who, as deputy commissioner of city works, had falsely certified the claims, a portion of the money received, in accused's office, by bills which he placed in accused's desk, which he denied.   Held, that the contractor, being in particeps criminis, might be corroborated by evidence of his receipt of money in the form of "bills" from the city.

8. OFFICERS—FALSE AUDITING—FRAUDULENT CLAIMS—EVIDENCE.

In a prosecution for conniving at the auditing of fraudulent claims against a city, on an issue whether accused, as deputy commissioner of

city works, had let work exceeding in cost the limit of his authority, by parceling it in different contracts, each within the limit, it was inadmissible to affect the question of guilty intent that a former incumbent did so under similar circumstances.

Appeal from Kings county court.

Robert W. Fielding was convicted of conniving at the auditing of a fraudulent claim against the city of Brooklyn, with intent to defraud, and he appeals. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Charles J. Patterson, for appellant.

Josiah T. Marean, Dist. Atty., for the People.

GOODRICH, P. J. The indictment accuses the defendant of "the crime of conniving at the auditing and allowance of a fraudulent claim against the city of Brooklyn, with intent to defraud." It charges that the crime was committed on December 22, 1897, and at other times; that John R. Sutton was at the time auditor of the city, and authorized to audit and allow for payment bills presented against the city; that the defendant then was a public officer, viz. deputy commissioner of city works; that a part of his duty was to take part in auditing and allowing claims and demands upon the city; that on December 22, 1897, with intent then and there to cheat and defraud the city, the defendant did "knowingly, willfully, and feloniously consent to and connive at the auditing and allowance of a certain claim, bill, and demand against the said corporation, the city of Brooklyn, which was false and fraudulent, and which contained charges, items, and claims which were false and fraudulent, and did indorse and sign on said bill his approval thereof, intending thereby to influence the said auditor to audit the same, and the same was thereafter audited for payment by said auditor." A copy of the bill is set out in the indictment, and reads as follows:

"General Fund.

"The City of Brooklyn to Henry E. Finkle (Residence, 407 Hamilton Ave.), Dr.: 1897. For furnishing and distributing earth filling, Dec. 16, on Neptune avenue, between West 12th and West 20th streets, over the water main, as per proposal,—1,528 cubic yards, at $1.30 cu. yd. Total dollars, $1,986.40."

Attached to the bill is an affidavit of Finkle, dated December 16, 1897, that the services and articles had been performed and furnished, and that the prices charged were reasonable and just.

The indictment further charges that the bill had been, or was about to be, presented to the auditor, as the defendant knew; that it was false and fraudulent, in setting forth that the city was on December 16th indebted to Finkle in such sum for such services and materials, whereas said services and materials had not been done and furnished, and the city was not so indebted, as the defendant well knew; that said bill was for work pretended to have been done under a contract, not limited in amount to $2,000, made by Finkle with the commissioner of city works, in behalf of the city, without the written consent of the mayor, and without advertisement for proposals, as required by law, which contract was not reduced to writing, nor executed by

the mayor or commissioner, nor attested by the city clerk; that it was not certified by the comptroller that a fund to meet the contract was provided, and that payments had already been made on such contract amounting to $19,726.20, all of which facts the defendant knew; and that he also knew that by reason thereof the city was not indebted to Finkle in any sum whatever.

Upon this indictment the defendant was brought to trial at a criminal term of the supreme court. The jury rendered a verdict of guilty of felony as charged in the indictment, and a judgment of conviction was entered thereon, from which the defendant appeals. The defendant was sentenced to be imprisoned for a term of $2\frac{1}{2}$ years in the state prison at Sing Sing, and to pay a fine of $2,171.60.

The indictment was found under section 165 of the Penal Code, which provides as follows:

"False Auditing and Paying Claims. A public officer, or a person holding or discharging the duties of any office or place of trust under the state, or in any county, town, city or village, a part of whose duties is to audit, allow or pay, or take part in auditing, allowing or paying, claims or demands upon the state, or such county, town, city or village, who knowingly audits, allows or pays, or directly or indirectly consents to, or in any way connives at the auditing, allowance or payment of any claim or demand, against the state, or such county, town, city or village, which is false or fraudulent, or contains charges, items or claims which are false or fraudulent, is guilty of felony, punishable by imprisonment for a term not exceeding five years, or by a fine not exceeding five thousand dollars, or by both."

During the years 1896 and 1897, John R. Sutton was auditor of the city of Brooklyn, and Theodore B. Willis was commissioner, and the defendant was deputy commissioner, of city works. The charter of the city of Brooklyn (Laws 1888, c. 583), section 1 of title 3, conferred upon the mayor the power to appoint certain heads of departments, and among them the commissioner of city works. The commissioner had the power to appoint a deputy, who "shall during the absence or inability of the head of the department by whom he was appointed, have power to perform all the ordinary duties of such head of department, except the power to make appointments, subject, however, to such restrictions or regulations as may be provided by the head of the department so appointing him." There was evidence tending to show that the defendant was charged by the commissioner with the general duty of examining and approving or rejecting bills and claims on matters arising in the department, whether or not the commissioner was absent or otherwise unable to attend to them. And it appeared by the testimony of the defendant that nearly all bills were examined and passed upon by himself.

The duties of the auditor are defined in title 5, where it is provided as follows:

"Section 1. * * * It shall be his [the auditor's] duty to examine all bills presented against the city for payment. No claim against the city, including claims for local improvements, shall be paid unless he shall certify that the services have been rendered or the materials furnished for which such bills may be presented, and that the charges are just and reasonable, or according to contract.

"Sec. 2. All moneys drawn from the treasury shall be upon vouchers for the expenditure thereof, examined and allowed by the auditor, and also approved by the comptroller, in whose office all such vouchers shall be filed.

"Sec. 3. No bill or claim shall be audited unless the same be made out in items; certified by the head of the department or officer having cognizance of the subject of the claim.

"Sec. 4. He shall also have the right to require from the different officers all the information which they possess, and to inspect any book, contract, resolution or other paper or document in their respective departments or offices, and it is hereby made the duty of all such departments and officers to furnish and permit the same when so required by him."

Title 4, § 1, which relates to the department of finance, provides that:

"No expenditures, debts or disbursements of the several departments or other officers shall be paid, except upon vouchers properly certified and audited, as provided by this act."

Title 3, § 11, subd. 2, provides that the mayor—

"Shall, jointly with the comptroller, sign all warrants, bonds and other obligations of the corporation. But he shall not sign any warrant or other obligation unless a proper voucher therefor shall have been first examined and certified to by him."

Title 18, § 3, provides that:

"No contract or agreement for any purpose, involving the payment of any money, shall be valid and binding against said city, unless the comptroller shall certify or indorse on such contract or agreement that the means required to make the payments under such contract are provided and applicable thereto. * * *"

Title 18, § 1, as amended by chapter 329 of the Laws of 1895, provides as follows:

"All contracts relating to the construction and maintenance of the water works exceeding in amount the sum of two thousand dollars, * * * shall also be made by the commissioner of city works, after advertising for proposals for ten days in the corporation newspapers, and shall be awarded by him to the lowest bidder, provided, however, that with the written consent of the mayor, the said commissioner may receive proposals for any of such purposes without advertisement therefor, and with such consent may award the contracts to others than the lowest bidders, and all contracts so awarded shall be executed by the mayor and the commissioner of city works and attested by the city clerk."

There was evidence tending to show that, by the ordinary course of business, claims arising in the department of city works were first certified by the head of the bureau having charge of the particular work, and passed to the commissioner of city works, or his deputy, and when approved by him were forwarded to the auditor, who approved and forwarded them to the comptroller, who in turn sent them to the mayor, with a warrant of payment for the latter's signature. Some years prior to 1896 the city had constructed a water main and sewer in Neptune avenue. The main was 12 inches in diameter, and had been laid on the surface of the earth along the line of the avenue, which was then laid out, but not graded. The sewer was partly above and partly below ground, and parallel with, and about 16 feet distant from, the main. Originally both main and sewer had been more or less covered with earth, showing two parallel ridges. In November, 1896, the defendant, as deputy commissioner of city works, executed a contract in writing with Daniel Doody, as contractor, by which the latter agreed to cover

the exposed portions of the 12-inch water main of the city, between West Twelfth and West Twentieth streets, a total length of 1,635 feet, said in the contract to require approximately 1,500 cubic yards of earth; the price to be $1.33 per cubic yard, and the whole amount to be expended under the contract not to exceed $2,000. The bill rendered under this contract was for 1,270 cubic yards, and amounted to $1,689.10. It was approved by the defendant, and paid in the usual course of business.

There was evidence tending to show the following facts:

In the fall of 1897 the covering of the main was in nearly the same condition as it was left in 1896, with some parts slightly exposed. Some time in September or October, 1897, interviews occurred between Daniel Doody and the defendant, Fielding. Doody testified substantially as follows: He had been doing several jobs of "invitation" work for the department, and had paid Fielding 10 per cent. of the amount received by him from the city therefor. He told Fielding that Oscar Knapp had informed him that the pipes on Neptune avenue needed to be covered, or were to be covered, and asked him if it was all right. Fielding replied that he would pass whatever Knapp recommended. Knapp was water purveyor, and head of one of the six bureaus of the department, and as such had charge of initiating proceedings for this kind of work. At a later interview, Doody told Fielding that it had been arranged that he was to have the work, and wanted it in the name of Finkle, whose address he gave him. He also gave Fielding the names of four persons who were going to bid on the work,—Haywood, Finkle, Frazier, and O'Connor,—all of whom, he said, represented himself. These persons were all connected in business with Doody, and he told Fielding that the same arrangement of 10 per cent. upon "invitation" work would be continued on this job. On October 15, 1897, Knapp addressed a letter to Commissioner Willis, stating that the 12-inch water main on Neptune avenue, from West Twelfth to West Twentieth street, was in a condition requiring immediate attention, that the earth covering had been reduced by various causes, that there was danger of injury to it by freezing or by fracture, that the length to be filled in was about 1,600 feet, and that the work could be done at an expense not to exceed $1.35 per cubic yard. He recommended that bids be solicited, and stated that it was a "matter of urgency." It will be observed that the letter called for filling over the water main alone. This letter was approved in writing by Fielding, who on the same day also caused to be entered on the records of the department an order that the water purveyor solicit bids for the work of covering the water main on Neptune avenue from West Twelfth to West Twentieth street, and not for any other filling. On October 16th Knapp wrote to Frazier, and on October 18th to Finkle and Haywood, asking proposals for the work, to be sent to the commissioner of city works; and on the 18th written proposals to do the work were sent to the commissioner by Finkle at $1.30, by Haywood at $1.40, and by Frazier at $1.70 per cubic yard. There was an entry in the record, directed by Fielding, stating the receipt of the three proposals, and the award of the

contract to Finkle; and there appear on Finkle's proposal the words: "Approved October 19, 1897. R. W. Fielding, Deputy Commissioner. R. W. F." The work of filling was proceeded with, and thereafter Finkle presented 11 bills for work done under this contract,—that is, for furnishing and distributing earth over the water main,—as shown in the following schedule:

| Date (1897). | Cu. Yds. | Amount. | Approved (1897). |
|---|---|---|---|
| Oct. 28 | 1,497 | $1,946.10 | Nov. 1 |
| Nov. 3 | 1,520 | 1,976.00 | " 24 |
| " 11 | 1,517 | 1,972.10 | " 24 |
| " 19 | 1,509 | 1,961.70 | Dec. 6 |
| " 20 | 1,508 | 1,960.40 | " 18 |
| " 23 | 1,530 | 1,989.00 | " 21 |
| " 26 | 1,529 | 1,987.70 | " 16 |
| Dec. 4 | 1,523 | 1,979.90 | " 18 |
| " 7 | 1,519 | 1,974.70 | " 20 |
| " 14 | 1,522 | 1,978.60 | " 22 |
| " 16 | 1,528 | 1,986.40 | " 22 |
| | 16,702 | $21,712.60 | |

The bills were similar to the one set out in the indictment, and on each of them was a memorandum, in red ink, put on in the purveyor's office: "From minutes, Oct. 18/97." The only entry on the record of that date relating to the Finkle contract is the approval of Finkle's bid, already stated. The bills and indorsements are similar, except as to variances of amounts and dates. The following entries, indorsements, or certificates also appear on each of the bills: An affidavit of Finkle that it is correct. "Examined by E. E." Or, in place of, and in several cases in addition to, the last: "Examined by O. K., F. Milne, Ass't Eng." Certificate of correctness, signed "Oscar Knapp, W. P." "Approved [with date]. R. W. Fielding, Deputy Commissioner." The bills were sent to the auditor, who approved them in writing, and they were afterwards audited by Sutton, as auditor, and paid by the city; the proceeds, or some part of them, coming into the possession of Doody, who testified that he paid Fielding 10 per cent. of the amount of each warrant, by opening the drawer of a desk in Fielding's office, at which Fielding was sitting, and putting the money therein, while they were conversing together, —no one else being in the office. On cross-examination, Doody stated that he paid to Fielding and others 40 per cent. of all moneys received on this and certain other former jobs. There was no advertising for proposals, no consent by the mayor that proposals might be received without advertisement, no consent to award to other than the lowest bidder, and no written contract executed by the mayor and commissioner of city works, and attested by the city clerk, as provided by section 1 of title 18 of the charter, above cited.

Evidence also was given by the prosecution tending to show that the entire length of Neptune avenue, between Twelfth and Twentieth streets, was about 1,600 feet, and that it would require only 1,600 cubic yards of earth to make a bank 3 feet high and 9 feet wide, amply sufficient to cover the entire main, even if there had been no previous covering, or if the original covering had entirely disappeared; that the amount of earth named in the 11 bills was 16,702 cubic yards,

which would be sufficient to make a bank 30 feet wide, 9 feet high, and 1,600 feet long; that in April, 1898, the condition of the street was substantially the same as in December, 1897; that, while there were some broken places, 5 cubic yards would have been sufficient to cover all the broken places; that there were not in April, 1898, 5,000 cubic yards in the whole embankment above the surface, including the water main and sewer, and all earth which had been filled in the entire width of the avenue, either before 1896, or in 1896 and 1897; and that there was no tide wash or any considerable sinking of the filling below the natural surface of the meadow. There was evidence on the part of the defendant that the amount of material in the embankment was 13,955 cubic yards, and that, with an allowance of 5,500 yards for settlement, there would be about 8,500 yards; that engineers ordinarily allow one-eighth for settlement in material, without regard to subsidence of foundation, which in the present case might be between 50 and 60 per cent.

The court instructed the jury, among other things, that the prosecution was bound to prove that the claim mentioned in the indictment was false or fraudulent, and also that the defendant knew it at the time he approved the bill, and that, if there was failure on either proposition, the defendant was entitled to an acquittal.

The defendant's counsel contends that section 165 of the Penal Code is "highly penal in its character, and must receive a very strict construction." The learned counsel has evidently overlooked section 11 of the Penal Code, which says:

"The rule that a penal statute is to be strictly construed does not apply to this Code or any of the provisions thereof, but all such provisions must be construed according to the fair import of their terms, to promote justice and effect the objects of the law."

With this provision in mind, I proceed to examine the arguments for reversal.

The first contention of the defendant's counsel is that the case does not fall within the provisions of section 165 of the Penal Code, above cited, as Fielding had no official authority effectively to audit or allow the bill in question, or take any part in doing so. The difficulty with this position is that it is based upon the first part of section 165, and entirely ignores the other words, which cover the case of a "public officer, or a person holding or discharging the duties of any office or place of trust," who "directly or indirectly consents to, or in any way connives at the auditing, allowance or payment of any claim against the  \*  \*  \*  city  \*  \*  \*  which is false or fraudulent, or contains charges, items or claims, which are false or fraudulent. \*  \*  \*" The auditor had no power to audit the bill, unless it was "certified by the head of the department or officer having cognizance of the subject of such claim." This made it possible and justifiable for the auditor to take into consideration the certification of a proper officer as one of the grounds for auditing and allowing a bill presented to him. It is evident from the language of section 1 of title 4 of the charter that certification of a bill by the proper department or officer is of the essence of the scheme of audit. This section provides that no expenditure shall be made, except upon vouchers prop-

erly certified and audited.    The certification must precede the audit, and the auditor is authorized to rely and act upon such certification. It is an integral part of the plan provided in the charter for the protection of the city from unjust and unfounded claims.    It cannot be said that such certification is not "a part" or a "taking part" in the audit and allowance of a claim against the city.    The indictment charges the defendant with having consented to or connived at the auditing or allowance of the bill, and indorsed to or signed his approval upon it, intending thereby to influence the auditor to audit the same. True it is that in the previous part of the indictment he was charged with taking part in the audit.    It is not even necessary for us, in this connection, to decide whether the evidence is sufficient to convict the defendant of that crime.    It is sufficient that there was evidence which justified a conviction for directly or indirectly consenting to or conniving at the auditing or allowing of a false or fraudulent claim against the city, and approving such claim, or certifying to the bill, intending thereby to influence the auditor to audit the same.

The counsel for the defendant also insists that "the defendant was neither the head of a department, nor an officer having cognizance of the subject of the claim in question."    It is not entirely clear that the words "officer having cognizance" refer at all to the deputy commissioner of city works, although they seem broad enough to cover the case.    The defendant was the deputy commissioner, with power, during the absence or inability of the commissioner, to transact any ordinary duties of the commissioner, subject to such restrictions or regulations as the commissioner might provide.    He was also "discharging the duties of any office or place of trust."    There was evidence tending to show that the commissioner was not absent from his office on December 22d, the day on which the bill was approved by the defendant; but the power of the defendant to act may rest upon the inability of the commissioner, or upon the general regulations of the department, or upon the fact that the defendant was discharging the duties of the office.    The use of the two words, "absence" and "inability," indicates that the legislature had in mind that something else than absence might prevent the head of the department from acting in all matters of business.    Force must be given to both words. The Century Dictionary's primary definition of "inability" is: "The state of being unable, physically, mentally, or morally; want of ability; lack of power, capacity, or means."    Clearly, the inability referred to in the section is not confined to simple physical inability to examine the bill and sign the approval.    It may depend upon the necessities growing out of such pressure of other official business as renders it impossible for the head of the department to attend to all the work of his office.    This may be such as to compel him to confide to the deputy certain kinds or portions of the business.    It was doubtless for this reason that the words "subject however to such restrictions and regulations" appear in the section.    The clause is not necessarily to be interpreted as one of limitation of the power of the commissioner or of his deputy, for both words are in the sentence,— "restrictions and regulations."    In other words, the commissioner can either restrict or regulate the exercise of the duties which he confers

upon the deputy, and, in the absence of any evidence that either was done, it must be assumed that the power of the deputy over business committed to him was untrammeled. It clearly appears that by the regulations of the department the constant practice of the defendant was to examine and approve such bills, and that ·in doing this he was discharging the duties of a place of trust. This appears by the numerous, if not exclusive, acts of the defendant in that respect; and, indeed, one of the excuses or reasons which he gave for his approval of the bill in question was that many hundreds of bills were pre-sented to him for approval, and that by reason of the multitude of such bills which were presented during the closing term of his office, in December, 1897, he could give each bill only a casual and superficial examination, and that he was compelled to rely upon the certificate of the engineer, who was a subordinate in his department. It would seem to be a fair inference that, if he relied upon such certificate, he was bound to assume that the auditor also would rely upon his certifi-cate of approval in making the audit. Whether the defendant, as deputy commissioner, was or was not authorized to approve the bill while the commissioner was neither absent nor physically disabled, makes no difference, as the defendant was a public officer, and acted either virtute officii in approving the bill, or else he was discharging the duties of "the office or place of trust," as stated in section 165; and this brings him within the charge of the indictment. In People v. Bowe, 34 Hun, 528, there was an indictment against the warden or keeper of the jail in the county of New York for perjury in mak-ing oath to an account or statement as to the support of prisoners in the jail, upon which a payment was to be made by the county. The defense was made that the defendant had no legal authority to make the affidavit; but it was held that it was no defense for the defendant to show that he was not the proper person to verify the account, so long as he did verify it. I think the analogy of this case and the one at bar is apparent. The defendant made a certificate of approval, which was part of the proof upon which the auditor acted in auditing the bill; and the defendant cannot be heard to plead absence of authority, when, in pursuance of the regulations of the office, or in the discharge of the duty of a place of trust, he approved the bill in question. The result of the defendant's approval was calculated to be, and was, influential in the audit of the bill; and the jury were justified in finding that his approval was a consenting to or conniv-ing at such audit, or that the defendant certified the bill, intending thereby to influence the audit.

The next contention of the defendant is that the evidence was not sufficient to establish that the bill in question was fraudulent, or that the defendant knew it to be so. This brings us to a consideration of the evidence. The defendant in November, 1896, as deputy commis-sioner of city works, executed a written contract with Doody, whereby the latter agreed "to furnish and deliver all materials, and furnish all appliances and labor, and do everything necessary to fill around and cover over the twelve-inch (12-in.) water main on Neptune avenue, as more particularly set forth in the following specifications, which form part of this agreement, to wit: 1st. The work required is the

covering of the exposed portions of the twelve-inch (12-in.) water
main on Neptune avenue, from a point about two hundred (200) feet
west of West 12th St. to the intersection of West 20th St., a to-
tal length of about sixteen hundred and thirty-five (1,635) feet; re-
quiring, approximately, fifteen hundred (1,500) cubic yards of earth."
Here was a definite statement as to the length of the line, and the
amount of earth deemed necessary to fill around and cover the main.
Unless the work could be done within the $2,000 limit, the defend-
ant had no power to make the contract without the consent of the
mayor.    The defendant cannot shelter himself by any plea of ignorance
or forgetfulness of the contents of this contract, and his approval of
the bill therefor.    It was a part of the records of the department.    He
executed it, and must be presumed, in so doing, to have exercised that
careful scrutiny which the law requires of all its public servants.    It
was not in October, 1897, an ancient transaction, and he must be held
to a knowledge of the fact that the water main had been recently
covered in pursuance of that contract, and of the amount of filling
necessary for that purpose; and yet within one year he approved a
new contract for again doing work similarly described and identified.
Let us assume, however, that under any circumstances he was justi-
fied in approving in October, 1897, the bid of Doody for the re-covering
of the main, or that by some sudden emergency he believed that it
had become necessary to re-cover it.    The indictment does not charge
fraud in respect of the defendant's approval of the first bill under
the contract.    But, when the first bill was presented to the defend-
ant for approval, it contained the statement that it was "for furnish-
ing and distributing earth filling  *  *  *  over the water main, as
per proposal, 1,528 cubic yards."    This proposal was made in pursu-
ance of a letter from Knapp, the water purveyor, which called for
proposals "for covering the 12-inch water main on Neptune avenue,
between West 12th and West 20th streets."    The defendant knew, or
was bound to know, that under the charter he could not enter into
a contract which required the expenditure of more than $2,000 with-
out advertising for bids, or obtaining the consent of the mayor there-
for.    He assumed to act under the emergency provision of the char-
ter in approving the proposal of Finkle.    If such action had ended the
transaction, it would have been possible to believe that he had simply
been overanxious, under the menace of some sudden injury to the
main arising from its exposed condition; but we find that after the
bill for this work was approved by him, on November 1st, without
any new proposals, or approval of any new proposals, he certified two
other separate bids, each for substantially the same amount, and for
the same work, on November 24th.    These were followed by another
bill and approved on December 6th, another on December 16th, by
two more on December 18th, by another on December 20th, another
on December 21st, and finally by two more on December 22d, one
of which last two is the eleventh bill in the schedule already given,
and the one upon which the indictment rests.    Each of the bills spec-
ified that it was for "furnishing earth filling, and distributing the
same over the water main," not for general filling, or distributing over
the sewer, or over any part of the avenue other than the water main,

while the amount of earth in each and every bill was more than suffi-cient to cover the main, if it had been newly laid and entirely bare. "A defendant in a criminal action is presumed to be innocent, until the contrary be proved." Section 389, Code Cr. Proc. But it would tax the imagination of the most credulous person in the world to be-lieve that the defendant did not know that fraud was stalking rampant through his department, when, in close proximity repeated, bills call-ing for nearly 10 times the amount of work and compensation named in the original proposal were presented to and approved by him with-in a period of 52 days, and in some instances 2 of them on the same day. The defendant must have known that he was repeating certifi-cations of bills for the identical work which he had already certified, and especially is this true of the work for which the last bill was certified. Certainly this is true as to the tenth bill, which he approved on the same day that he approved the eleventh, and still more is it evident as to the eleventh. The whole scheme was a manifest and repeated evasion of the $2,000 limitation of the charter, and it is very clear that upon the evidence the jury were justified in finding that the bill was fraudulent, and that the defendant had such guilty knowl-edge as to the fraudulent character of the bill set out in the indict-ment as is essential to his conviction. After a careful reading of the evidence, even excluding the testimony of Daniel Doody, it is im-possible to reach any other conclusion than that the defendant formed a deliberate scheme to evade the $2,000 contract limitation of the charter, so that he could give out the contract to selected bidders without public advertisement, and that for this purpose he arranged a plan by which he should approve a contract on its face calling for a sum within the limit, and make this single contract a basis for nu-merous bills, all for similar work and amount, which were to be ren-dered from time to time during the short remainder of his official life, or just as long as the matter could be conducted secretly and without public or official scrutiny.

It was also proper for the court to admit evidence of all the defend-ant's transactions in certifying the 10 bills which preceded the·cer-tification of the bill of December 22d, in order to show the knowledge of the defendant that numerous bills for work which had been ac-tually or properly done upon the main had been already certified by him for the purpose of having the same audited in the regular course· of business.

The defendant's counsel urges with great earnestness that it was error to admit the testimony of Mr. Sutton, the auditor, that he made no other investigation than an examination of the bill itself. This is based upon a question addressed to Sutton:

"Q. In auditing this bill, did you make any other investigation than the inspection of the bill itself as it came to you? (Objected to as immaterial, irrelevant, and incompetent, on the ground that what he did that was not with defendant's knowledge or at defendant's direction, and which intervened after we had performed our services with regard to the bill, could not retroact so as to affect the character of our act in having approved this bill.)"

After some inquiries by the court, the witness answered:

"I audited this bill in good faith, in the honest discharge of my duty, be-lieving that it was a proper claim against the city to be allowed. I exercised

my judgment on it. It was my duty to do so. I know from the face of the bill itself that it is incurred under the authority of an entry on the minutes of the city works department. From the minutes of October 18, 1897, I knew that no written contract had been entered into for that work. I knew that no written contract had been filed in the comptroller's office and certified by the comptroller. It was the practice of the department of city works to certify these bills for less than $2,000 where no written contract had been entered into."

Even if the question called for immaterial, irrelevant, or incompetent evidence, the answer, which does not seem to have been a direct answer to the question, was admissible to show that the certification by the defendant was a part of the evidence upon which the audit was made; and this reaches the very gravamen of the indictment. It was competent to show that the defendant took part in the proceedings upon which the audit was made, or thereby connived at the audit of the bill.

Another exception to the admission of evidence requires consideration. This relates to evidence of the receipt of money by Doody from the city, both upon the Finkle bills, and other bills on previous jobs. Doody testified that he paid the defendant 10 per cent. of the amount received by him on previous work, and had said to him that "the same arrangement would go along as we had been doing,— the same arrangement would be carried out." He testified without objection that he had paid Fielding 10 per cent. of the amount received by him from the city on a previous job, for New Utrecht avenue. When the prosecution attempted to prove a similar state of facts on another previous job, for Wartman avenue, the defendant's counsel objected. We do not see, however, that the admission of the evidence as to Wartman avenue or as to the Finkle bills could materially injure the defendant, as one similar instance had already been proved without exception. We must not lose sight of the fact that Doody was particeps criminis, and that his testimony was open to suspicion, and the jury might believe or disregard it altogether. There were some circumstances as to which he testified which were subject to contradiction, if untruly stated, but they were not denied. Doody testified:

"On each warrant I paid the sum of ten per cent. to Mr. Fielding. It might be a little over. * * * I could not name the specific sum in each case. Never gave any odd cents; always even money. * * * I did the paying myself, in Fielding's office, in cash. * * * I mean in bills. The payments were made by opening the desk that was right in the front (a roll-top desk), opening the drawer of the desk, and putting it in the drawer, right in front of him,—directly in front. He was at the time sitting down alongside the desk. The drawer was not open. I opened it, and put the money in, and closed it. Sometimes conversing with him. There was never any one else in the office besides myself."

He also testified that during 1896 and 1897 he paid Fielding more than $12,000; that the payment on the first 10 warrants was about $2,000, approximating 10 per cent. on the amount of those bills. The defendant, indeed, denied the story, but did so in a somewhat limited manner. His testimony on the matter is as follows:

"Witness: I don't know whether these men had been bidders before or not. I never had any transaction with Daniel Doody in which he paid me

ten per cent. upon any money he had received out of any public contract. I never had any talk with Daniel Doody about receiving ten per cent. on invitation work, or any work in which he was engaged. Q. He says he came and put bills in a drawer in a desk where you were sitting, and went away and left them there. Did ever any such transaction take place? A. Not to my knowledge. Witness: I never saw him do it. I never got any money out of any drawer. I never had any arrangement or conversation or understanding, direct or indirect, either with Daniel Doody or any other person, that I should get any money out of any public work that went through the department."

There can be no question that Doody, on his own evidence, was a party principal in the crime with which the defendant was charged. Section 29 of the Penal Code reads:

"A person concerned in the commission of, a crime, whether he directly commits the act constituting the offense, or aids and abets in its commission, and whether present or absent, and a person who directly or indirectly counsels, commands, induces or procures another to commit a crime, is a principal."

Section 399 of the Code of Criminal Procedure reads:

"A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect. the defendant with the commission of the crime."

It was therefore material and proper to corroborate the testimony of Doody by showing that he actually had money, and that in bills, to make the payment to Fielding in the method which he stated. Under these circumstances, I think the admission of the testimony as to the receipt of money from the city by Doody worked no injury to the defendant, and is not reversible error.

The defendant offered evidence to show that under the previous commissioner of city works the practice had existed to give out work without advertisement for bids, when the aggregate cost exceeded $2,000, and then make out bills under $2,000, but in all aggregating a larger amount. It was stated by defendant's counsel that the evidence was offered to corroborate the testimony of Fielding that he had heard of such practice. The court said:

"I will let you corroborate that he heard it; that this witness told him so. I think, so far as regards the guilt, the criminal knowledge, that it bears upon the case, whether he was so informed or not. * * * "

The court properly excluded the fact as to the circumstances under which a former commissioner gave out work, but the defendant did not avail himself of the permission to prove aliunde the defendant's knowledge or information as to the existence of such practice.

The record contains ample evidence that the defendant, with Daniel Doody, concocted and carried out a brazen scheme to defraud the city; that he was cognizant of all that was being done in pursuance of the plan; that he assisted it in all its stages; that for his own benefit and profit he basely betrayed the public trust reposed in him. And his conviction is a righteous retribution, and a vindication of our judicial system for the discovery and punishment of unfaithful officials.

We find nothing in the record to justify the charge that the district attorney exceeded his duty either in his opening or his closing address to the jury. Impartially, both to the people and to the

defendant, he presented to the jury the facts shown by the evidence. His conduct not only calls for no disapproval from this court, but meets with our cordial approbation.

The judgment and conviction must be affirmed. All concur in result.